IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ADIEL G.,** | : | **CIVIL ACTION** |
| **Plaintiff,** | : | |
| | : | |
| **vs.** | : | **NO.   24-cv-5459** |
| | : | |
| **FRANK BISIGNANO,** | : | |
| **Commissioner of Social Security,** | : | |
| **Defendant.** | : | |

## <u>MEMORANDUM OPINION</u>

**LYNNE A. SITARSKI**
**UNITED STATES MAGISTRATE JUDGE**                     **November 25, 2025**

     Plaintiff Adiel G. brought this action seeking review of the Commissioner of Social Security Administration's decision denying his claim for Social Security Disability Insurance (SSDI) and Supplemental Security Income (SSI) benefits under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f.  This matter is before me for disposition upon consent of the parties.  For the reasons set forth below, Plaintiff's Request for Review (ECF No. 24) is **DENIED.**

## I.      PROCEDURAL HISTORY

     Plaintiff initially protectively filed for SSDI and SSI on January 17, 2020, alleging disability since July 15, 2019, due to shoulder pain.  (R. 89, 471).  Plaintiff's applications were denied at the initial level and upon reconsideration, and Plaintiff requested a hearing before an ALJ.  (R. 89-144, 180-94, 207-08).  Plaintiff, represented by counsel, and a vocational expert (VE) testified at the April 20, 2021, administrative hearing.  (R. 64-83).  On May 17, 2021, the ALJ issued a decision unfavorable to Plaintiff.  (R. 145-64).  Plaintiff appealed the decision to

the Appeals Council, which granted Plaintiff's request for review on October 17, 2022, on the basis that the ALJ's evaluation of certain medical evidence[1] was in error. (R. 165-71). The Appeals Council remanded the case back to the ALJ to address the error. (*Id.*). The ALJ scheduled another administrative hearing on April 28, 2023, though no testimony was taken at that hearing. (R. 22 n.1). On August 15, 2023, the ALJ held a third administrative hearing at which Plaintiff, represented by counsel, and a VE testified. (R. 45-63). On September 19, 2023, the ALJ issued a decision unfavorable to Plaintiff. (R. 16-44). Plaintiff again requested review by the Appeals Council, which was denied on August 22, 2024, thus making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. (R. 1-6).

On October 13, 2024, Plaintiff filed a complaint in this Court and consented to my jurisdiction pursuant to 28 U.S.C. § 636(C) two days later. (Compl., ECF No. 1; Consent Order, ECF No. 4). On August 7, 2025, Plaintiff filed a Brief and Statement of Issues in Support of Request for Review. (Pl.'s Br., ECF No. 24). The Commissioner filed a Response on September 9, 2025, and on October 7, 2025, Plaintiff filed a Reply. (Resp., ECF No. 25; Reply, ECF No. 28).

## II.    FACTUAL BACKGROUND

The Court has considered the administrative record in its entirety and summarizes here the evidence relevant to the instant request for review.

Plaintiff was born on November 13, 1982, and was 36 years old on the alleged disability

---

[1] Specifically, in his May 17, 2021, decision the ALJ found the opinion of Adam E. Hyatt, M.D. that Plaintiff was limited to sedentary work with "no use of right arm" was persuasive, but ultimately did not incorporate these limitations into his RFC finding. (R. 167). The Appeals Council noted that these findings were therefore "conflicting" and remanded the case for the ALJ to resolve the conflict. (*Id.*)

onset date.  (R. 472).  His past relevant work includes work as material handler.  (R. 55).

A.    **Medical Evidence**

Plaintiff has a history of recurring shoulder pain in both shoulders, coupled with strength and mobility issues.  He has undergone two arthroscopic surgeries on his left shoulder and one on his right shoulder, and additionally has had over half-a-dozen epidural steroid injections for his shoulders in an effort to remediate his pain and mobility issues.  (R. 1107).

Plaintiff has treated for pain in his left shoulder since at least 2018.  (*See, e.g.*, R. 666).  Plaintiff underwent a left shoulder arthrogram at Lancaster General Radiology on August 2, 2019, which revealed: a partial tear of the distal anterior supraspinatus tendon; evidence of a previous surgery attempting to remediate biceps tenodesis and tear of the superior labrum anterior-posterior (SLAP); and a moderate irregularity at the anterosuperior labrum suggesting degeneration or a recurrent SLAP lesion.  (R. 687).  The results also suggested "labral degeneration or a recurrent SLAP lesion."  (*Id.*).

Plaintiff treated with Corey Troxell, D.O., of Lancaster Orthopedic Group (LOG) beginning in 2019.  (*See, e.g.*, R. 645-758, 1104-1152).  On March 12, 2020, Plaintiff presented to Dr. Troxell complaining of left shoulder pain.  (R. 713-14).  Plaintiff was assessed with left shoulder biceps tendinitis.  (R. 713).  Upon physical examination, Plaintiff was positive for joint pain and myalgias; negative for back and neck pain; had normal range of motion in his neck; had 4/5 strength of the supraspinatus, interspinous, and subscapularis; and was mildly positive for Neer and Hawkins impingement testing.  (R. 714).  Dr. Troxell completed medical opinions on August 5, September 5, October 3, November 4, and December 5, 2019, that assessed limitations including: occasionally climbing ladders, pushing/pulling with his upper extremities, and lifting or carrying 15 pounds; never reaching at or above chest level; and simple grasping and fine

manipulation limitations.  (R. 640-44).  Plaintiff continued to treat with Dr. Troxell and others from LOG for the next several years in an attempt to remediate his shoulder pain.  (*See, e.g.*, R. 645-758, 1104-1152).

On October 30, 2020, Plaintiff presented to Adam E. Hyatt, M.D. of Orthopedic Associates of Lancaster (OAL) complaining of right shoulder pain.  (R. 967).  He reported that after lifting a large water jug, he felt a "crack" and since that time had experienced significant pain in his right shoulder.  (*Id.*).  He rated his right shoulder pain as seven out of 10 and described it as "sharp, stabbing, and burning."  (*Id.*).  Nevertheless, upon examination Dr. Hyatt noted that Plaintiff: had no deformity in his spine and lumbar regions; had no scarring or swelling in his right shoulder; showed no obvious medial or lateral scapular winging; and had normal scapulothoracic motion.  (R. 969).  Dr. Hyatt rated Plaintiff's motor strength of the supraspinatus and infraspinatus as four out of five, and the teres minor and subscapularis as five out of five, while also noting Plaintiff's cervical motion was normal.  (R. 970).

At this same visit, Dr. Hyatt noted that Plaintiff had previously dealt with recurring pain in his left shoulder, that he had undergone two arthroscopic surgeries and a steroid injection for that shoulder from which he never fully recovered, that he had a superior glenoid labrum lesion in his left shoulder, and that he had tendonitis in his left bicep.  (R. 968-69).

Plaintiff received an arthrogram of his right shoulder on November 9, 2020, which revealed a tear in his superior labrum but otherwise normal findings, including that his rotator cuff and biceps tendon were intact.  (R. 958).

Dr. Hyatt later diagnosed Plaintiff with a superior labral tear with posterior extension, biceps tendinosis, and subacromial bursitis.  (R. 937).  Dr. Hyatt performed surgery on his shoulder on January 25, 2021, in an effort to remedy these issues.  (R. 937-40).  Physician

4

assistant Ryan Farley was present for the operation. (R. 937). During the surgery Dr. Hyatt made the following observations: type 2 unstable SLAP tear, with extension also involving the posterior labrum; positive peel back sign noted; degenerative inner margin fraying involving the anterior labrum, though still well-attached to the edge of the glenoid; synovitis surrounding the intra-articular portion of biceps, with some associated tendinosis; intact biceps tendon; grade 0 degenerative changes using the Outerbridge classification to the articular surfaces of the glenoid and humeral head; intact supraspinatus infraspinatus rotator cuff and subscapularis; and mild synovitis along the anterior capsule and superior to the superior labrum. (R. 938). No complications occurred, and Plaintiff was stable after the operation. (R. 939).

Plaintiff had several follow-up visits with providers from OAL between February 2021 and April 2023, consistently complaining of shoulder pain and typically rating it at least a six out of 10. (R. 1048, 1061, 1228, 1232, 1238, 1243, 1247, 1253, 1259). He occasionally described his pain as radiating up and down his upper extremities to his fingers; reported that his arms felt tender, numb and weak; and at times complained of neck and back pain as well. (R. 1228, 1232, 1234, 1240, 1246, 1247, 1255, 1259, 1261-62, 1265). He also received several more epidural and steroid injections in an effort to treat his pain, though they were ultimately ineffective. (R. 1241, 1243, 1249, 1262, 1265).

At a follow-up appointment with Dr. Hyatt on February 2, 2021, Plaintiff noted that the pain in his shoulder had worsened. (R. 921). Plaintiff was using a sling for his right arm at this time and had been prescribed pain medication. (R. 921-22). Upon examination, he was in no acute distress, he was not experiencing back or neck pain, and his axial spine, neck, and lumbar regions showed no gross deformity—but he was positive for joint pain and myalgias. (R. 921-23). Two days later, Plaintiff's pain and physical examination results were largely the same. (R.

929-31).  Dr. Hyatt noted that Plaintiff was "doing well" and that his pain was at "an appropriate level" and ultimately opined that Plaintiff could return only to sedentary work with no use of his right arm.  (R. 916, 930).  Plaintiff was directed to wear a brace for four weeks following the surgery and to restrict his use of his right shoulder to a "gentle range of motion."  (R. 930-31).

On March 6, 2021, Plaintiff presented to Farley for a follow-up examination after the surgery performed on his right shoulder.  (R. 1194-98).  On a scale of 10, Plaintiff rated the pain in his right shoulder an eight and reported that his ongoing physical therapy sessions were "not going very well."  (R. 1194).  Plaintiff was positive for joint pain but negative for back and neck pain.  (R. 1194-95).  Farley noted Plaintiff's ongoing shoulder issues as well as his right biceps tendinitis.  (R. 1195).  Plaintiff's right upper extremity was neurovascularly intact, he had 4/5 strength in his right shoulder, and his right biceps was tender to touch.  (R. 1196).  At that same visit Farley also reviewed the results of a left shoulder contrast that Plaintiff had undergone two days prior, which showed joint osteoarthritis and tendinopathy since the prior surgeries on that shoulder.  (R. 1196-97).  At a subsequent visit on May 14, 2021, Plaintiff rated his pain a six, and Farley noted mostly similar findings, adding that Plaintiff also presented with tendinitis in his left shoulder and that his right shoulder rotation strength had improved to 5/5.  (R. 1198-1200).  Plaintiff reported feeling "slightly improved" in terms of his shoulder strength and range of motion.  (R. 1201).  Farley opined that at that point in time, Plaintiff was "permitted return to work, but w[ith] restrictions being no lifting, carrying, pushing, or pulling greater than 20 lbs and not above shoulder height."  (*Id.*).

On July 20, 2021, Dr. Hyatt noted that Plaintiff had no erythema warmth, swelling, or tenderness in his right shoulder and assessed that he had 5/5 rotator cuff strength with mild to moderate discomfort upon rotation.  (R. 1205).  Dr. Hyatt performed a corticosteroid injection to

treat his right shoulder pain. (R. 1206). Then on September 7, 2021, Plaintiff reported six out of 10 pain, though Dr. Hyatt assessed him with 5/5 strength in his right rotator cuff. (R. 1206, 1211). Notwithstanding the improved strength in his rotator cuff, Plaintiff still complained of pain upon movement testing. (R. 1211). Based on Plaintiff's continued pain, Dr. Hyatt ordered another arthrogram for his right shoulder which was conducted on September 22, 2021. (R. 1219). On September 28, 2021, Dr. Hyatt reviewed the results, again noted tendinitis in Plaintiff's right biceps and rotator cuff and diagnosed Plaintiff with synovitis and rotator cuff irritation. (R. 1220). The next day Plaintiff received another corticosteroid injection to treat his pain. (R. 1222).

Plaintiff presented to Dr. Hyatt again on November 16, 2021, complaining of pain throughout his right upper extremity. (R. 1223). He reported that his pain was "worse" and rated it a six out of 10. (*Id.*). Dr. Hyatt noted that Plaintiff had no erythema warmth, swelling, or tenderness in his right shoulder or pectoral and assessed him with 5/5 strength in his rotator cuff. (R. 1225). Based on Plaintiff's treatment history and several arthrograms and MRIs of Plaintiff's shoulder, Dr. Hyatt opined that Plaintiff's pain "seem[ed] more radicular in origin" and stated that he did not "appreciate any structural reason" for it. (R. 1226).

On March 22, 2022, Plaintiff reported that he continued to have radiating pain and numbness in his neck and bilateral upper extremities, though he was not attending physical therapy and was taking Tylenol as needed to manage his pain. (R. 1232). He also reported having no strength in his hands due to his pain. (*Id.*). Upon examination, Dr. Hyatt noted that he was in no acute distress and that his axial spine and lumbar regions showed no gross deformity. (R. 1233-34). Dr. Hyatt assessed Plaintiff with cervical radiculopathy at C5, neck pain, numbness and tingling in his right arm, superior glenoid labrum lesion of right shoulder, and

long term left shoulder joint sprain affecting the shoulder girdle and the rotator cuff. (R. 1234). With regard to Plaintiff's right shoulder specifically, Dr. Hyatt noted "5/5 strength[, m]inimal Neer and Hawkins symptoms, and no significant tenderness to palpation." (*Id.*).

At a February 26, 2021, physical therapy session with Kaitlyn Messner of OAL, Plaintiff reported that he was unable to: open tight jars; turn a key; prepare meals; open heavy doors; place an object on a shelf above his head; perform heavy household chores; garden or do yard work; make his bed; carry a shopping bag, briefcase, or other heavy objects; change a lightbulb overhead; wash or blow-dry his hair; bathe; use a knife to cut his food; or engage in certain recreational activities. (R. 1031). In addition, he had severe difficulty: writing; putting on a pullover sweater; and managing his transportation needs. (*Id.*). Upon physical examination, Plaintiff's right shoulder had decreased range of motion in flexion, abduction, external rotation, and functional internal rotation, as well as decreased strength of the rotator cuff and scapulothoracic stabilizers. (R. 1033). Messner assessed Plaintiff with a "DASH score"[2] of 93% and noted that one of Plaintiff's long-term goals would be to achieve a DASH score of 30%. (R. 1032, 1034).

Plaintiff then followed up with Messner on March 30, 2021. (R. 1046-50). His DASH score was 68 percent and he rated his pain an eight on a scale of 10. (R. 1047-48). Messner assessed Plaintiff's right shoulder with 3/5 abduction and external rotation and 3+/5 flexion and internal rotation. (R. 1048). However, she also noted that Plaintiff was "progressing with [range of motion] and strength to date," and encouraged Plaintiff to continue pursuing home therapy

---

[2] The Disabilities of the Arm, Shoulder and Hand ("DASH") questionnaire is a tool created by the American Academy of Orthopedic Surgeons to measure the disability levels those body parts. (*See* Pl.'s Br., ECF No. 24, at 14 n.20). Plaintiff notes that "[t]he lower the score, the better the patient's condition." (*Id.* at 14).

exercises.  (R. 1049).

At another physical therapy session on April 30, 2021, Melissa Swope also assessed Plaintiff's right shoulder, noting that he had 3+/5 flexion, abduction, and external and internal rotation.  (R. 1057).  She also noted that he had decreased strength in his rotator cuff.  (R. 1058).  Plaintiff's DASH score at this session was 54 percent, and he rated his pain a seven on a scale of ten.  (R. 1057).  Plaintiff's long-term goals were to increase his flexion strength to 4+/5, reduce his DASH score to 30 percent, and to be pain free.  (R. 1057-58).

On September 1, 2021, Plaintiff had another physical therapy session with Messner.  (R. 1100-02).  Plaintiff's DASH score had reduced to 43 percent, though his pain was still a six on a scale of ten.  (R. 1101).  Upon examination of his left shoulder, Messner assessed Plaintiff with 3/5 flexion, 3-/5 abduction, and 3+/5 external and internal rotation.  (R. 1102).

On January 3, 2023, Plaintiff presented to Michael St. Onge, D.O., of LOG complaining of chronic neck and shoulder pain and diffuse radiating pain throughout both upper extremities.  (R. 1110).  Upon examination Dr. St. Onge assessed Plaintiff with 5/5 muscle strength in his upper extremities and noted that he was negative bilaterally for Spurling's maneuver, though he also noted that: Plaintiff's cervical range of motion was "restricted diffusely in all planes"; Plaintiff exhibited "diffuse bilateral para-cervical muscle tenderness"; "[a]xial spinal loading [was] equivocal for facet joint pain"; and Plaintiff was positive for neck pain.  (R. 1113).

On April 22, 2020, State agency consultant Josie Henderson, M.D., opined that Plaintiff was able to occasionally lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; sit, stand, and/or walk (with normal breaks) for a total of about six hours in an eight-hour workday; never climb ladders, ropes, or scaffolds; occasionally push, pull, or reach overhead and frequently reach in front and laterally with the left upper extremity; and occasionally and crawl.

(R. 95-112).  On October 15, 2020, State agency consultant Michael Mesaros Jr., M.D., offered a nearly identical opinion as to Plaintiff's physical limitations.  (R. 121-42).

### B.     Non-Medical Evidence

Plaintiff testified at the August 15, 2023, administrative hearing that his shoulder issues and pain had increased during the pendency of the disability period and that he could no longer move his hands due to his pain.  (R. 49-50, 55).  He informed the ALJ that he had surgery on his right shoulder on January 25, 2021, to repair a torn rotator cuff and to reduce his pain, mobility, and strength problems.  (R. 50-54).  He continued to treat both shoulders afterwards through physical therapy and medication.  (R. 50-53).  However, Plaintiff testified that the treatment did not work, that he continued to experience debilitating pain in both shoulders, and that his pain precluded him from performing normal activities of daily living (ADLs) including dressing, feeding, and bathing himself.  (R. 51).

Plaintiff also testified that he had begun to experience arthritis and other musculoskeletal issues in his neck and spine, for which he had started receiving treatment.  (R. 53).  He received several branch block injections to his neck in an attempt to treat the pain and arthritis (which had allegedly spread from his neck to both shoulders), but these injections were ultimately ineffective.  (R. 53-54).

Plaintiff completed an adult function report on April 14, 2020.  (R. 549-61).  He noted that his shoulder pain began in 2012 when he had an accident.  (R. 560).  According to him, his pain has continued since then and has sapped all the strength from his arms.  (*Id.*).  He claimed that the pain in both arms prevented him from performing normal personal and work activities. (R. 552).  For instance, he was unable to prepare meals or perform house or yardwork.  (R. 554). However, he admitted that he had "no problem" dressing, bathing, or performing other self-care

tasks, and that he was able to walk and drive. (R. 553, 555). Though he acknowledged that the injections he received relieved his pain for approximately one week each time, he stated that his pain would return each time. (R. 561). Ultimately, Plaintiff stated that he spent most days at home watching television because his physical impairments prevented him from doing anything else. (R. 556). Moreover, he noted that he was unable to lift more than 15 pounds, nor could he lift his arm above his chest. (R. 557).

Plaintiff's friend, Jessica Semidey, completed a third-party adult function report on September 4, 2020, making many of the same claims regarding the extent of Plaintiff's debilitating symptoms. (R. 577-85). She stated that his condition "worsens everyday," his arm was "completely useless," and that she spent "a few" hours per day with Plaintiff to help him with "everything . . . in his daily life." (R. 578).

## III.   LEGAL STANDARD

To be eligible for benefits under the Social Security Act, a claimant must demonstrate to the Commissioner that he cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least 12 months. 42 U.S.C. § 1382c(a)(3)(A). A five-step sequential analysis is used to evaluate a disability claim:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If he is not, then the Commissioner considers in the second step whether the claimant has a "severe impairment" that significantly limits his physical or mental ability to perform basic work activities. If the claimant suffers a severe impairment, the third inquiry is whether, based on the medical evidence, the impairment meets the criteria of the impairment listed in the "listing of impairments," . . . which result in a presumption of disability, or whether the claimant retains the capacity to work. If the impairment does not meet the criteria for a

> listed impairment, then the Commissioner assesses in the fourth step
> whether, despite the severe impairment, the claimant has the
> residual functional capacity to perform his past work.  If the
> claimant cannot perform his past work, then the final step is to
> determine whether there is other work in the national economy that
> the claimant can perform.

*Sykes v. Apfel*, 228 F.3d 259, 262-63 (3d Cir. 2000); *see also* 20 C.F.R. §§ 404.1520(a)(4),

416.920(a)(4).  The disability claimant bears the burden of establishing steps one through four.

If the claimant is determined to be unable to resume previous employment, the burden shifts to

the Commissioner at step five to establish that, given the claimant's age, education, work

experience, and mental and physical limitations, he is able to perform substantial gainful

activities in jobs existing in the national economy.  *Poulos v. Comm'r. of Soc. Sec.*, 474 F.3d 88,

92 (3d Cir. 2007).

      Judicial review of a final decision of the Commissioner is limited.  A district court is

bound by the factual findings of the Commissioner if they are supported by substantial evidence

and decided according to correct legal standards.  *See, e.g.*, *Hartranft v. Apfel*, 181 F.3d 358, 360

(3d Cir. 1999).  Substantial evidence is "more than a mere scintilla," and "such relevant evidence

as a reasonable mind might accept as adequate."  *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112,

118 (3d Cir. 2000) (citations omitted).  Even if the record could support a contrary conclusion,

the decision of the ALJ will not be overruled as long as there is substantial evidence to support it.

*See, e.g.*, *Simmonds v. Heckler*, 807 F.2d 54, 58 (3d Cir. 1986).  The Court exercises plenary

review over legal issues.  *See, e.g.*, *Schaudeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 431 (3d Cir.

1999).

## IV.    ALJ'S DECISION

      The ALJ issued a decision in which he made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2024.

2. The claimant has not engaged in substantial gainful activity since July 15, 2019, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: bicipital tendinitis, (bilateral upper extremities), right rotator cuff tendonitis, osteoarthritis of the right shoulder, degenerative disc disease of the cervical spine, bipolar disorder, depression, and anxiety (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform less than the full range of sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a). He is limited to occasional crawl [sic], no ladders, ropes, or scaffolds, occasional reaching overhead with the bilateral upper extremities, and frequent reaching in front and laterally with the bilateral upper extremities. He may perform simple, repetitive, routine tasks, cannot work at production rate pace, and may have occasional interaction with the public and supervisors. He is limited to a low stress job defined as few workplace changes.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on November 13, 1982 and was thirty-six years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has a limited education (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from July 15, 2019, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(R. 25-37).  Accordingly, the ALJ found that Plaintiff was not disabled.  (R. 37-38).

## V.    DISCUSSION

Plaintiff presents two claims in his request for review, including that the ALJ erred: (1) in his evaluation of the medical evidence; and (2) in his consideration of Plaintiff's subjective complaints regarding his symptoms.  (Pl.'s Br, ECF. No. 24, at 4).

For the following reasons, I disagree with Plaintiff and affirm the ALJ's decision.

### A.    The ALJ's Evaluation of the Medical Evidence

#### 1.    The Parties' Arguments

Plaintiff's first claim primarily revolves around the ALJ's evaluation of the medical opinions of Dr. Hyatt and Farley, though his arguments under this section also touch on whether substantial evidence supports the ALJ's RFC determination generally.

First, Plaintiff takes issue with the ALJ's vacillation on the persuasiveness of Dr. Hyatt's medical opinion.  He lays out the procedural timeline in this case, including that: (1) the ALJ initially found Dr. Hyatt's February 4, 2021, opinion to be persuasive in his May 17, 2021, decision, specifically noting that it was "supported by objective findings of a mildly reduced 4/5 upper extremity strength," and consistent with Plaintiff's reports of shoulder pain; (2) the ALJ nevertheless determined that Plaintiff was not disabled; (3) the Appeals Council vacated the ALJ's May 17, 2021, decision, identifying internal inconsistencies between Dr. Hyatt's opinion (credited by the ALJ) and the ALJ's ultimate disability determination; and (4) the ALJ's subsequent finding on remand that Dr. Hyatt's opinion was actually *not* consistent with the rest

of the record evidence, "including clinical examination findings of 5/5 strength of the right

shoulder." (Pl.'s Br., ECF No. 24, at 5-9 (citing R. 34-35, 157-58, 167, 916)). Plaintiff argues

that the ALJ's decision to change his mind on remand as the evidence regarding Plaintiff's

shoulder strength, and ultimately the persuasiveness of Dr. Hyatt's opinion, violated the

applicable regulations because it was unsupported by the record evidence and therefore

constituted impermissible "cherry-picking." (*Id.* at 7-16). He contends that the ALJ

impermissibly "changed his evaluation so as to eliminate the[] 'no use of right upper extremity

restriction'" contained in Dr. Hyatt's opinion. (*Id.* at 9; *see also* Reply, ECF No. 28, at 4-6). In

arguing that Dr. Hyatt's opinion was indeed persuasive and supported by other record evidence,

Plaintiff points to: the opinion of Farley, who noted that Plaintiff's shoulder condition would

result in significant functional limitations; clinical examination findings of only 3/5 or 4/5

strength in Plaintiff's shoulders; and the various DASH scores indicating Plaintiff was

significantly disabled and never reached his rehabilitation goals, per those scores. (*Id.* at 8-14).

Second, Plaintiff argues that the ALJ abdicated his duty to evaluate all relevant medical

evidence by failing to consider Farley's May 14, 2021, opinion. (*Id.* at 7-8). After briefly

summarizing the substance of Farley's opinion, The ALJ stated:

> However, *Dr. Hyatt's opinion* is not consistent with all of the
> objective evidence pertaining to [Plaintiff's] right shoulder
> impairment, including clinical examination findings of 5/5 strength
> of the right shoulder, full range of motion of the right shoulder,
> good resistive strength of the right shoulder, normal muscle tone of
> the right upper extremity, and no atrophy of the right upper
> extremity. Thus, the undersigned only finds *Dr. Hyatt's opinion*
> persuasive to the extent it indicates [Plaintiff's] right upper
> extremity impairment in combination with [Plaintiff's] other
> severe physical impairments limits [Plaintiff] to a range of work at
> the sedentary exertional level.

(R. 35 (emphasis added) (record citations omitted)).

Based on this, Plaintiff maintains that the ALJ "never actually evaluate[d]" Farley's opinion. (Pl.'s Br., ECF No. 24, at 8). This in itself was error, according to Plaintiff, as the ALJ is tasked with evaluating *all of the record evidence*. (*Id.* at 8, 14-16). Ultimately, he argues that the opinions of Dr. Hyatt and Farley are consistent with each other, that other record evidence is also consistent with the two opinions (including Plaintiff's physical therapy records and his own statements regarding the extent of his disability), and that the ALJ therefore erred in failing to fully consider and credit each opinion. (*Id.* at 8-16).

The Commissioner responds that nothing about the ALJ's evaluation of the medical evidence was error. First, he contends that Dr. Hyatt did not cite to any outside evidence to support his opinion—a noteworthy omission given that Plaintiff's clinical examination results were more consistent with a finding that Plaintiff was capable of sedentary work. (Resp., ECF No. 25, at 9-10). Next, he argues that the ALJ weighed the opinion of Dr. Hyatt against other medical evidence—including the opinions of Drs. Troxell, Hernandez, and Mesaros—ultimately finding those opinions more persuasive insofar as they showed that Plaintiff could perform "a range of sedentary work." (*Id.* at 7-9). More specifically, the Commissioner contends that the ALJ explained that these three opinions "were somewhat consistent with Plaintiff's medical records on a longitudinal basis, including clinical examination findings" of: suppleness, normal range of motion, and no crepitus of the neck; upper extremities with normal sensation and muscle tone generally and no atrophy; 5/5 strength and full range of motion of the right shoulder; intact "gentle" range of motion of the right elbow and right wrist; a neurovascularly intact left upper extremity with 4+/5 strength; and a negative Spurling's maneuver, bilaterally. (*Id.* at 9 (citing R. 33-34)). Based on the foregoing evidence, the Commissioner ultimately contends that the ALJ's evaluation of Dr. Hyatt's opinion was not erroneous. (*Id.* at 11).

As to the ALJ's treatment of Farley's opinion, the Commissioner's response is twofold: (1) the ALJ simply made a clerical mistake in substituting Dr. Hyatt's name for Farley's in the analysis of Farley's opinion; and (2) for all the reasons that substantial evidence supports the ALJ's determination that Dr. Hyatt's opinion was not fully persuasive, Farley's opinion is also not fully persuasive, and the ALJ was therefore justified in his determination that it, too, was only partially persuasive.  (Resp., ECF No. 25, at 9-11).

### 2.    Analysis

The ALJ is responsible for fashioning a claimant's RFC.  A claimant's RFC is what he can still do despite his established impairments.  20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  In making an RFC determination, the ALJ must consider all evidence before him.  *See Plummer v. Apfel*, 186 F.3d 422, 429 (3d. Cir. 1999).  That evidence includes medical records, observations made during formal medical examinations, descriptions of limitations by the claimant and others, and observations of the claimant's limitations by others.  *See Fargnoli v. Massanari*, 247 F.3d 34, 41 (3d Cir. 2001); 20 C.F.R. §§ 404.1545(a), 416.945(a).  An ALJ must consider the medical opinions together with the rest of the relevant evidence, and explain the weight given to those opinions in his decision.  *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 362 (3d Cir. 2006).  While there is an undeniable medical aspect to the evaluation of medical opinions, it is well settled that "[t]he ALJ—not treating or examining physicians or State agency consultants—must make the ultimate disability and RFC determinations."  *Id.* at 361.  When confronted with several medical opinions, the ALJ can choose to credit certain opinions over others but "cannot reject evidence for no reason or for the wrong reason."  *Mason v. Shalala*, 994 F.2d 1058, 1066 (3d Cir. 1993) (quoting *Cotter v. Harris*, 642 F.2d 700, 707 (3d Cir. 1981)).  Further, the ALJ can credit parts of an opinion without giving credit to the whole opinion and may formulate a

claimant's RFC based on different parts of different medical opinions, so long as the rationale

behind the decision is adequately articulated. *See, e.g.*, *Byrd v. Comm'r of Soc. Sec.*, No. 23-

4957, 2024 WL 4631645, at *9 (E.D. Pa. Oct. 30, 2024); *Durden v. Colvin*, 191 F. Supp. 3d 429,

455 (M.D. Pa. 2016).

    The social security regulations "require, an ALJ to offer 'a narrative discussion

describing how the evidence supports'" the limitations imposed. *Hess v. Comm'r of Soc. Sec.*,

931 F.3d 198, 209 (3d Cir. 2019) (citing SSR 96-8P, at *7). An "ALJ 'may not reject [a

physician's findings] unless he first weighs them against other relevant evidence and explains

why certain evidence has been accepted and why other evidence has been rejected.'" *Mason*,

994 F.2d at 1067 (quoting *Kent v. Schweiker*, 710 F.2d 110, 115 n.5 (3d Cir. 1983)); *see also*

*Carter v. Railroad Retirement Bd.*, 834 F.2d 62, 65 (3d Cir.1986).

    When evaluating medical evidence, the most important factors are supportability and

consistency, and the ALJ must explain how he or she considered these factors for a medical

source's medical opinions or prior administrative medical findings in the determination or

decision. 20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c). Although the ALJ is not required "to

use particular language or adhere to a particular format in conducting [the] analysis," the

decision must contain "sufficient development of the record and explanation of findings to

permit meaningful review." *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004) (citing *Burnett*,

220 F.3d at 119).

    Based on the above principles, the ALJ did not err in his evaluation of the medical

evidence. Plaintiff's contentions on this point amount to a mere disagreement with the ALJ

regarding how much weight to assign the varying pieces of evidence in the record. *See Perkins*

*v. Barnhart*, 79 F. App'x 512, 514-15 (3d Cir. 2003) ("[The claimant's] argument here amounts

to no more than a disagreement with the ALJ's decision, which is soundly supported by substantial evidence."); *Markoch v. Comm'r of Soc. Sec.*, No. 1:20-CV-00417, 2020 WL 7586953, at \*4-5 (D.N.J. Dec. 22, 2020) ("It is Plaintiff's burden to establish the severity of her impairments, and Plaintiff's challenge to the ALJ's consideration of her non-severe impairments amounts to mere disagreement with his analysis rather than showing any substantive error."); *see also Titterington v. Barnhart*, 174 F. App'x 6, 11 (3d Cir. 2006) ("Surveying the medical evidence to craft an RFC is part of the ALJ's duties.").

### a.    The ALJ's Evaluation of Dr. Hyatt's Opinion

First, to the extent that Plaintiff argues there was something improper about the ALJ making a different factual finding as to the persuasiveness of Dr. Hyatt's opinion on remand, "[w]hen the Appeals Council vacates a final decision of the Commissioner, the ALJ must consider all pertinent issues *de novo*." HALLEX I-2-8-18, 1993 WL 643058; *see also Leventhal v. Kijakazi*, No. 20-cv-3157, 2021 WL 5163202, at \*9 (E.D. Pa. Nov. 5, 2021) ("Once vacated, the new ALJ was required to issue a new decision and consider all pertinent issues *de novo*.") (citing *Butterfield v. Astrue*, No. 06-0603, 2010 WL 4027768 (E.D. Pa. Oct. 14, 2010)); *Neiswonger v. Saul*, No. 18-1306, 2019 WL 5895431, at \*2 (W.D. Pa. Nov. 12, 2019) (quoting HALLEX I-2-8-18); *Coleman v. Berryhill*, No. 3:17-cv-01824-RDM-GBC, 2019 WL 1323418, at \*13 (M.D. Pa. Feb. 14, 2019) ("The ALJ was not bound by a prior vacated decision."). So long as the ALJ's new findings pertaining to the record evidence were backed by substantial evidence, his decision to depart from his prior factual findings should not be disturbed. *Hartranft*, 181 F.3d at 360. For the reasons laid out later in this opinion, *see infra* § (V)(A)(2)(iii), I find that it does.

### b.    The ALJ's Evaluation of Farley's Opinion

I also agree with the Commissioner that the ALJ's use of "Dr. Hyatt" instead of "Farley" in his analysis of the latter's opinion was clearly a clerical error that does not warrant remand. *See Commons v. Saul*, No. 2:18-cv-62, 2019 WL 4601687, at *4-5 (E.D. Tenn. Sep. 23, 2019) (finding that an ALJ's "misstatement" regarding the extent of the claimant's education was "a clerical error that ha[d] no bearing on the analysis") (citing *Powers v. Comm'r of Soc. Sec.*, 195 F. App'x, 407, 412-13 (6th Cir. 2006) (omissions in an ALJ's formal findings do not constitute reversible error if the intended meaning may be discerned from the text of the decision)).  As the Commissioner notes, the ALJ summarized the substance of Farley's opinion, not Dr. Hyatt's. (R. 35).  Additionally, the fact that the ALJ provided the same rationale for discrediting both Dr. Hyatt's and Farley's opinions does not establish Plaintiff's conclusion that the ALJ failed to consider the substance of Farley's opinion; instead, the more logical conclusion is simply that in weighing Farley's opinion, the ALJ found the same rationale dispositive in finding the opinion only partially persuasive.  Nothing about this was error.  Therefore, under the applicable law, again the only question is whether substantial evidence supported the ALJ's decision not to fully credit these two opinions.  For the following reasons, I find that it does.

### c.    The ALJ's Evaluation of the Record Evidence

Substantial evidence supports the ALJ's findings.  In finding the opinions of Dr. Hyatt and Farley to be only partially persuasive (and in ultimately determining that Plaintiff has the capacity to perform sedentary work), the ALJ contrasted the more extreme limitations assessed by Dr. Hyatt and Farley with other record evidence indicating Plaintiff's right shoulder had full strength and mobility and that his pain was not as significant as he claimed.  That evidence included: the medical opinions of Drs. Troxell, Hernandez, and Mesaros, which were consistent

with the ability to perform sedentary work; clinical examination findings that Plaintiff's shoulders demonstrated improved strength and range of motion as time elapsed after his surgeries; and statements from the Plaintiff himself indicating his pain was not fully debilitating. (R. 29-36 (citing Exs. 1A, 2A, 5A, 6A, 1F, 2F, 3F, 5E, 10F, 11F, 15F, 16F, 18F)).  For instance, the ALJ specifically noted that Plaintiff was assessed with 5/5 strength in his right shoulder (the one primarily at issue in this appeal) no less than five times between September 5, 2019, and January 3, 2023, including by Dr. Hyatt himself on several occasions post-surgery.  (*See* R. 30-31 (citing R. 743, 970, 1113, 1205, 1211, 1225, 1230, 1234)).

Moreover, the ALJ also highlighted several instances in the record wherein Plaintiff noted either that he was pain-free or that his pain did not preclude him from performing certain daily tasks, including: his April 14, 2020, adult function report wherein he noted that although he experienced significant pain, his symptoms did not preclude him from walking, driving, dressing, bathing, or performing other self-care tasks, (R. 30 (citing R. 553, 555)); consistent clinical findings wherein Plaintiff regularly denied experiencing neck or back pain and occasionally noted his shoulder pain had improved, (R. 30-35 (citing R. 714, 921-23, 1106, 1126, 1130, 1134, 1138, 1142, 1146, 1194-95, 1253, 1255, 1263-64, 1267)); and Plaintiff's acknowledgement that the injections he received relieved his pain, at least temporarily, (R. 30-31 (citing R. 561)).

As for his left shoulder, neck, and lumbar regions generally, the ALJ noted the following, *inter alia*: on October 11, 2019, Plaintiff was assessed with normal sensation of the upper extremities and 4+/5 strength in his left shoulder, (R. 30 (citing Ex. 2F)); on October 14, 2020, Plaintiff was noted to be able to raise his left arm above his head with no snapping or crepitus during range of motion testing, (*Id.* (citing Ex. 11F)); on January 15, 2021, Plaintiff had a supple neck and normal extremities, (*Id.* (citing Ex. 11F)); on October 21, 2021, Plaintiff's left upper

extremity was neurovascularly intact, (R. 31 (citing Ex. 15F)); on May 3, 2022, Plaintiff had

normal muscle tone and no atrophy of the upper extremities, (*Id.* (citing Ex. 18F)); on August 18,

2022, Plaintiff's cervical back had normal range of motion and his left upper extremity was

neurovascularly intact, (*Id.* (citing Ex. 15F)); and on January 3, 2023, Plaintiff was assessed with

normal sensory, 5/5 strength of the upper and lower extremities, and displayed a negative

Spurling's maneuver bilaterally, (*Id.* (citing Ex. 15F)).

      Though Plaintiff points to his physical therapy records that, according to him, indicate he

had less than full strength in his right shoulder following his surgery, (Pl.'s Br., ECF No. 24, at

12-15 (citing R. 1030-1103)), those records actually undermine Plaintiff's position.  The DASH

scores upon which he relies show a positive, linear progression as he continued treatment after

his surgery; his pain reduced steadily from an eight to a six on a scale of ten, and Messner noted

on March 30, 2021, that Plaintiff was "progressing with [range of motion] and strength."  (R.

1032, 1047-49, 1057, 1101).  Though Messner and Swope may have also assessed Plaintiff with

less than full strength, the ALJ was permitted to accept certain parts of their findings and reject

others.  *Byrd*, No. 23-4957, 2024 WL 4631645, at *9 (ALJs may "credit parts of an opinion

without crediting the entire opinion") (citing *Durden*, 191 F. Supp. 3d at 455).

      Ultimately, the foregoing constitutes substantial evidence supporting the ALJ's

determination that Dr. Hyatt's and Farley's opinions were only persuasive to the extent that they

were consistent with the ultimate determination that Plaintiff's shoulder pain was not completely

debilitating and that he could perform sedentary work.  *Hartranft*, 181 F.3d at 360; *Burnett*, 220

F.3d at 118.

      Finally, Plaintiff insists that the altered finding regarding the persuasiveness of Dr.

Hyatt's opinion is merely a smokescreen to mask the ALJ's true motive to eliminate the "no use

of right upper extremity" restriction and ensure his ultimate finding of "not disabled." (Pl.'s Br.,
ECF No. 24, at 8-9). However, in light of the substantial evidence cited by the ALJ in support of
his decision, this Court declines to engage in speculation about the ALJ's purported motive in
reaching a different conclusion about the persuasiveness of Dr. Hyatt's opinion in the post-
remand administrative decision. *See Granados v. Comm'r of Soc. Sec.*, No. 13-781 (JLL), 2014
WL 60054, at *9 n.7 (D.N.J. Jan. 7, 2014) ("[T]he Court will not entertain Plaintiff's speculation
as to the ALJ's motive. The task before this Court on appeal is to review whether the ALJ's
decision is based on substantial evidence."). Accordingly, the Court denies Plaintiff's request for
remand based on the ALJ's treatment of the opinions of Dr. Hyatt or Farley.

B.      **The ALJ's Evaluation of Plaintiff's Subjective Complaints**

1.      **The Parties' Arguments**

Plaintiff's second claim revolves around the ALJ's consideration of his statements
concerning the intensity, persistence, and limiting effects of his symptoms related to his
shoulder. (Pl.'s Br., ECF No. 24, at 17-27). First, Plaintiff alludes to the ALJ's so-called
"boilerplate" analysis of Plaintiff's statements, citing several cases from this circuit as well as a
Seventh Circuit case for the proposition that the recitation that "[Plaintiff's] statements
[concerning] the intensity, persistence, and limiting effects of [his] symptoms are not entirely
credible for the reasons explained in this decision" is a "conclusory" or "boilerplate" statement.
(*Id.* at 18-19 n.25 (quoting *Lamoreaux v. Berryhill*, No. 3:17-cv-00238, 2018 WL 746384 at *7
(M.D. Pa Feb. 7, 2018); *Parker v. Astrue*, 597 F.3d 920, 921-22 (7th Cir 2010); *Colon v. Comm'r
of Soc. Sec.*, No. 12–4870 (JLL), 2013 WL 6116849, at *1 (D.N.J. Nov. 19, 2013))). Plaintiff
then argues that under Third Circuit precedent the ALJ was required to either accord Plaintiff's
statements great weight or identify other, credible contrary medical opinions refuting the

23

subjective testimony.  (*Id.* at 20-21).  According to Plaintiff, because the ALJ failed to point to evidence refuting his subjective statements regarding his pain, the ALJ's decision should be vacated.  (*Id.* at 21).

Plaintiff argues in the alternative that even if the ALJ's opinion could be read to include some sort of analysis of other record evidence pertaining to Plaintiff's pain, that portion of the ALJ's opinion is insufficient.  (*Id.* at 21-27).  On this point, Plaintiff acknowledges that the ALJ noted several times that: (1) Plaintiff's treating providers consistently found him to be in no "acute distress"; and (2) clinical examination results indicated that Plaintiff consistently demonstrated 5/5 strength in Plaintiff's shoulders.  (*Id.* at 21-23).  However, according to Plaintiff "[t]he [ALJ's] emphasis on lack of acute distress is without probative value" given that "[t]he term 'acute' means it comes on quickly and is intense, rather than being a long-term or chronic problem."  (*Id.* (citing Nat. Inst. of Health, Nat. Library of Med., *Impact of the DSM-IV to DSM-5 Changes on the National Survey on Drug Use and Health*, https://www.ncbi.nlm.nih.gov/books/NBK519704/table/ch3.t30/; Lukas Alfons Huber, M.D., *Acute distress*, Balu Med, https://balumed.com/en/medical-dictionary/acute-distress (last updated 2/28/24))).  Further, he notes that the term "distress" is "so broad as to be useless."  (*Id.* at 22).  Plaintiff then argues that the record evidence illustrated less than full strength, and that no evidence exists equating strength loss with pain intensity.  (*Id.* at 23).  In other words, Plaintiff argues that any findings regarding his strength, or lack thereof, "do[] not indicate lack of pain" and instead amount to "the ALJ making a lay judgment" regarding medical severity.  (*Id.*).  Finally, Plaintiff contends that one of the relevant factors the ALJ must consider in evaluating the severity of his pain symptoms is the extent of his ADLs.  (*Id.* at 24).  According to Plaintiff, he stopped driving, needs help with personal care, and has become a full recluse.  (*Id.* at 26).  He

adds that had the ALJ properly evaluated his ADLs, he would have necessarily concluded that Plaintiff was, in fact, disabled based on the debilitating pain he experiences every day.  (*Id.* at 24-27).

The Commissioner responds that although the ALJ was required to give great weight to Plaintiff's subjective statements regarding the severity of his symptoms, he was "not required to credit them."  (Resp., ECF No. 25, at 12 (quoting *Chandler*, 667 F.3d at 363)).  Instead, the Commissioner argues that as long as substantial evidence supported the ALJ's factual findings regarding Plaintiff's symptoms, the court must defer to his analysis of Plaintiff's subjective complaints.  (*Id.* (citing *Horodenski v. Comm'r of Soc. Sec.*, 215 F. App'x 183, 189 (3d Cir. 2007); 20 C.F.R. § 404.1529(c)(4))).  Here, because the ALJ "fully considered the record" including the hearing testimony, adult function reports, consultative examiner reports, the reports of his treating providers, and Plaintiff's ADLs, the Commissioner argues that the ALJ's determination must be affirmed.  (*Id.* at 12-13).

### 2.    Analysis

Again, Plaintiff's contentions on this point amount to a mere disagreement with the ALJ regarding how much weight to assign the varying pieces of evidence in the record.  *See Perkins*, 79 F. App'x at 514-15.  As noted above—and in contrast to Plaintiff's characterization of the ALJ's decision—the ALJ did in fact consider Plaintiff's subjective statements regarding the severity of his pain and other symptoms and weighed them against the other record evidence relating to that point.  (*See supra* § V(A)(2); R. 29-36 (citing R. 714, 921-23, 1106, 1126, 1130, 1134, 1138, 1142, 1146, 1194-95, 1253, 1255, 1263-64, 1267)).  The fact that the ALJ did not accept Plaintiff's testimony in its entirety and ultimately credited other record evidence which indicated that, while not pain-free, Plaintiff was able to perform sedentary work was within his

purview as factfinder.  *See Chandler*, 667 F.3d at 361; *see also Andreolli v. Comm'r of Soc. Sec.*, No. 07-1632, 2008 WL 5210682, at *4 (W.D. Pa. Dec. 11, 2008) ("[I]t is well settled that a claimant need not be pain-free or experiencing no discomfort in order to be found not disabled.") (citing *Welch v. Heckler*, 808 F.2d 264, 270 (3d Cir.1986)).

For this same reason, Plaintiff's contention that the medical notes pertaining to the strength and mobility of his shoulders were not relevant also fails as the pertinent question is to what extent Plaintiff's pain and other symptoms limit his functionality.  Given that he asserted at various times that his pain was entirely debilitating and sapped all his strength, (*see, e.g.*, Pl.'s Br., ECF No. 24, at 24; R. 560), the ALJ was tasked with investigating the veracity of his claim. In doing so, the ALJ was permitted to rely, in part, on evidence indicating that in fact his shoulder strength and mobility improved following various surgeries, and that they displayed full strength and good mobility.  Next, to the extent Plaintiff takes issue with the ALJ's reliance on the related clinical findings that Plaintiff was in "no acute distress" on a consistent basis, that was just one of the several factors relied upon by the ALJ, and it was not improper for the ALJ to note as much.  *See Calhoun v. Colvin*, No. 13-5220, 2015 WL 6164046, at *6 (E.D. Pa. Sep. 16, 2015) (relying, in part, on the fact that "[the claimant] was well-appearing [and] in no acute distress" to find that substantial evidence supported the ALJ's disability determination).  Lastly, Plaintiff's contention that his testimony regarding his ADLs (or lack thereof) foreclosed a finding of not disabled fails for two reasons.  First, evidence of a claimant's ADLs is but one of many factors that an ALJ must consider.  *See* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). Second, as noted above, the ALJ considered evidence pertaining to Plaintiff's ADLs and implicitly found his testimony not consistent with other record evidence.  (*See* R. 29-36).

Accordingly, the Court denies Plaintiff's second claim as well.

26

## VI.    CONCLUSION

For the reasons set forth above, Plaintiff's Request for Review is **DENIED**.  An appropriate Order follows.

BY THE COURT:


  /s/ Lynne A. Sitarski
LYNNE A. SITARSKI
United States Magistrate Judge